May it please the court and counsel, I'm John Engelstrom, here today on behalf of Idaho Agricultural Credit Association. I'd also like to introduce one of my partners, who's also present, Mr. Daniel Green. Mr. Green is infinitely more familiar with this case, having been with it from its inception, essentially, but somehow he found a way to enable me into presenting the argument here today. On behalf of IACA, we're here today because after the Van Ordens signed a written agreement in January of 2000 that granted IACA a first lien security interest in all crops and in all crop proceeds, the Van Ordens sold some of those crops. On the asserted basis of a so-called cash collateral provision that was included in their amended Chapter 11 plan, which plan was filed and confirmed after the stipulation between IACA and Van Ordens was signed, they requested that IACA simply endorse the crop checks so that they could pay junior and unsecured creditors for farming expenses that they incurred in the year 2000. Now, IACA disputed the application of this cash collateral provision and denied that in any way was it obligated or required to release its first priority lien in those crop proceeds, but nevertheless asked the Van Ordens for some additional information, and after they got some, not all the information they requested, but some information about the nature of the expenses that they wanted to pay, IACA did release a portion of those proceeds to the extent of some little over $103,000, which was more than what the Van Ordens had originally requested. Could I interrupt you for a moment just to start with some threshold questions I had about waiver? Your opponent here argues that three of your arguments were waived. One was whether the bankruptcy court urging concluding that Article 13 of the plan applied to the 2000 crop proceeds. They say this wasn't raised before BAP. Second, the question whether the bankruptcy court urging holding that the debtors could use the 2000 crop proceeds even if they were in default under the stipulation, and they assert that wasn't raised before the bankruptcy court, and the anticipatory breach issue wasn't raised before either the bankruptcy court or the BAP. Can you address whether those arguments have been waived so we shouldn't address them here? I think I can. Also, I think whether Article 13 is ambiguous. Was that another one? I think I can address all those. Frankly, we made a part of the excerpts of record here the briefs that were submitted in support of the motions for summary judgment. We also submitted the transcript of the oral arguments made to the bankruptcy judge, Judge Pappas, in the bankruptcy court. I think we've also submitted all of the briefs that were submitted to the bankruptcy appellate panel. If you look at the bankruptcy court's opinion, you'll find that he addresses all of those issues that were raised. We've cited in the briefs to this court the portions of the excerpt of record where those arguments were made in the briefing to the court, and in the transcript as well, where all of these issues were argued in court and addressed by the judge. And frankly, I think all of them are likewise addressed in the bankruptcy court's memorandum decision, which is also part of the excerpt of record. I would cite, it's volume two, tab 25, beginning at page 1355 of those excerpts of record. But certainly we disagree that any of those arguments were waived, not preserved, and that they were all argued into the appropriate courts. Thank you. What's the present status of the debtors? Excuse me? What is the present status of the debtors? Well, the debtors, I don't think, are doing any farming. They are still residing in the home on the property. As indicated in the briefs, IACA did file a state court action to collect the debt and also to foreclose against the collateral. But that case has been essentially on hold, stay, pending resolution of this issue. It was essentially pursuant to a stipulation between counsel to take that issue of the interplay between the cash collateral provision and the first lien provision. Then why are we here? Whatever we decide is moved, isn't it? No, Your Honor. I mean, if they're not farming, there's no money, what's going to happen? Well, there's a case still pending in district court. There are still assets. That's not before us. No, I understand. But that's what the fight is about, is because they have also counterclaimed for damages against IACA by reason of this alleged breach of the Chapter 11. They don't have any money to pay you, even if you've got a billion-dollar judgment. If we get a judgment, there is still some property to be foreclosed, yes. How much property? I don't know. There's an acreage of where their home is and the home and I think also the son's home. I'm not certain of the total value of those assets, Your Honor. After the Van Ordens failed to make the first annual payment under the Chapter 11 plan to IACA, and that would have been in the approximate amount of $230,000 or the payment to Simplot in the amount of $260,000, that is when IACA filed the state court action. On cross motions for summary judgment in the bankruptcy court, solely on the issue of whether or not this cash collateral provision allowed the debtors to use these 2,000 crop proceeds, the district court held for the Van Ordens, arguing that that provision did authorize them to use the proceeds from the sale of the crops, even though IACA had a first-lane security interest in those crops. We feel that the bankruptcy court erred in several respects. First, in determining that the 2,000 crop proceeds are even cash collateral under the plan and the applicable law. Significant to that issue is the precise language of that provision itself that appears in the Chapter 11 plan. The term cash collateral there isn't just used in isolation. Rather, it is specifically referenced as being cash collateral as defined in 11 U.S.C. 363a. Can you explain how that provision would make any sense if, in fact, how the parties could possibly have intended that the consent in advance to use of cash collateral terminated as soon as the plan was confirmed? I couldn't think of a scenario where that would make sense and the parties could actually have intended that. Well, you've got to remember, I think, that there were this is like the third plan that was submitted. This is kind of a boilerplate provision in these Chapter 11 plans. This particular case had been in the bankruptcy court for, I think, more than a year. During all this time, there certainly was cash collateral, and there was cash collateral being used by the debtors. In other words, the 1998 crop proceeds were used by the debtors to finance their operation during the 1999 crop year. Obviously, that would have been cash collateral. In the year 2000, the debtors were supposed to use 1999 crop proceeds to pay the operating expenses for 2000. The district court's bankruptcy court's decisions clearly shows that the debtors made two pre-confirmation payments to Simplot. Again, that would have been cash collateral, as that money would have come from crops in which both Simplot and IACA had joint first-priority entry. It was signed in March 2000. The plan itself, I guess, was confirmed in March 2000. Right. Was there a 2000? Was there proceeds from sale of crops in March 2000 that would be covered, or was that just terminated by that? I mean, had crops been sold in 2000 for that by March? No. I think that they we know some crops had been sold because there were two rather large pre-confirmation payments made. We also know that at the time of confirmation, there were payments made to both Simplot and IACA, and we also know that throughout the remainder of that farming year. But at that point, according to your interpretation of this provision, the plan is confirmed, and so there's no longer any consent in advance to use the cash collateral. There would have been cash collateral there because that would have been the 1999 crop proceeds that were being used for the farming expenses in the year 2000. The bankruptcy estate would have had an interest in those crop proceeds before and at the time of confirmation, and the plan then provided that those proceeds were going to be able to be used by the debtors to complete the year 2000 farming operator. I'm sorry to beat this, but it's an important point, it seems to me, and I just want to make sure I understand IACA's interpretation of this. So at the point when the plan was confirmed and that agreement becomes an agreement between the parties, your interpretation of that, I guess it's Article 13, is that cash collateral in which you had a security interest that had been spent before the date of the plan confirmation, you were retroactively approving that use. Is that how you interpreted that provision? I don't think it applies only to money that was spent prior to confirmation. The cash collateral was already in the estate because of crops that were sold, and it was anticipated that that cash was going to be used post-confirmation. But the provision wouldn't allow that, right? Excuse me? The provision wouldn't allow that cash collateral to be used post-confirmation because then it becomes the debtors' cash collateral, not the estate's, right? So I guess I'm still not understanding the scenario. I know, but for purposes of defining those crop proceeds that arose while there was a bankruptcy estate as opposed to the crop proceeds that occur in the end of 2000 or in 2001, those never were cash collateral. The ones from the 1999 crop year. That were in the estate. That were in the estate. And you're saying after plan confirmation? Those were at least initially cash collateral under the definition. And after plan confirmation, did they remain cash collateral? Are they still in the estate even after the plan is confirmed? They are the only ones that could be considered cash collateral, even though upon confirmation title vests back into the debtors at that time. But we think that the only application of that provision would be to those funds that constituted cash collateral prior to the confirmation. And we have no objection, and I think the plan called for that, and we understood that, and there's nothing inconsistent with our stipulation in that regard. See, IACA, after it made its agreement and it provided that, nothing was going to affect that first priority lien except for subordinating up to $300,000 to the fertilizers supplier. And also providing that nothing in the future reorganization plans could alter, amend, or modify any of the terms of the stipulation. And also providing that any inconsistencies or any conflicts between that stipulation and the plan or any confirming order thereafter would be governed by the stipulation. Frankly, IACA had very little interest in what the debtors put in their plan after that point and really had no incentive to object to any of that because the agreement that they made with the debtors was essentially the whole agreement that was made, and nothing could change those provisions. By the express language of the stipulation, by the express language of the plan that was submitted, and by the order that confirmed that plan, any inconsistencies were going to be governed by the stipulation. As a consequence, IACA really had no input at all on this cash collateral provision. My answer to your question is only our analysis of what that provision could possibly apply to. You want to save some time for rebuttal? Yes. Am I out of my first? That's all there is. Oh, all right. Any more questions? Thank you. May it please the Court, Counsel, in this particular case, as you know the status with respect to the Van Orden, there is a state court pending. The state court case has a counterclaim for seeking damages. The basis for the damages is that they were put out of business. What happened in this particular case is that we started a state court case. We determined that the judge who actually signed the order confirming a plan, which had two stipulations connected with such, ought to be the one who interprets that particular plan. We don't have merely a contract here, but we have an order from a court. I find it interesting, Your Honors, that the approach used is to say we had nothing to do with this cash collateral provision. It's not something that we even, so to speak, agreed to. If you look at the order of confirmation, it is signed off by Dan Green, who approves the plan, which connects the two stipulations. It all becomes one deal. From a background standpoint, we have farmers here who raised potatoes and raised wheat and typically sold their potatoes late in the spring. That's when they could derive the highest price. They had Indian leases that they had to enter into in December of the previous year, which required outlay of cash. They had startup costs, which would come into existence prior to them making a payment, which was not due until May 15th. So what would happen was, in this particular case, they would use the funds as long as they were current, and the farming operation, which would get them through until the May 15th date, when they would market their potatoes just beforehand and allow it to make the payments to the creditors. The thing they can issue about the debtor is out of compliance with the budget, and you're not supposed to use 2,000 cash to pay 2,000 expenses, with the concept being you'll be out of money by the time the 2001 May 15th payment comes. Was the debtor out of compliance with the budget, and doesn't that defeat the spirit of the agreement with the creditor? First off, what budget are we talking about, and the reason why I make that, raise that issue, Your Honor, is in this particular case, the stipulation refers to a budget contained in the plan. There is no budget in the plan. There's no budget attached to the plan. There's no budget attached to the order of confirmation. There's no budget attached to the stipulation. The budget that has now become part of the record is one that was provided during the confirmation proceeding. But if you're going to rely upon that stipulation, then that stipulation is such that it does not suggest that that budget is even the budget we ought to be looking at. And, no, it's our position. We were not out of compliance. Furthermore, it's important that what happened in this particular case, they were returning their payments, they needed money for farming operation in December, they asked for the funds, and they came back and said, no, you're not entitled to such because we have the stipulation, and the stipulation controls, and it's the only thing that controls. In other words, let us take the plan and the provisions of the plan out of the agreement. And said, no, and oh, by the way, now we're going to put you in default and give you 30 days. Now, that's important, too, because they can only use default if they give a 30-day cure period. And in this particular case at the time the funds were sought in December, there was no default that had been asserted. We weren't even into the 30-day cure period that came later. Now, with respect to this Article 13, I think it's important because you asked some questions about that. These parties are very well aware of what cash collateral is about. They are in bankruptcy. They know what it's about. In addition to that, they've been involved in cash collateral from the previous year. At the time of confirmation, prior to confirmation, we have a plan provision that refers to cash collateral. Cash collateral is referred to previous to confirmation, which is what it is. And therefore, explaining what it is and explaining it by definition takes it out of merely a provision in bankruptcy and makes it a plan provision. And what happens is if you read its entirety, which is required of any contract, it's clear because the language refers to the fact that it says that debtors may continue to use cash collateral, which has now been defined by a bankruptcy statute but integrated into this plan, in their farming operation provided that the plan pay months. This is not a one-year concept. This is the only way that these individuals, these farmers, are going to be able to continue to farm. That is, as Judge Pappas indicated, their only source of funds. What happened in the particular case of 1999? They used their funds. Cash collateral got them through to 2000, excuse me, 98 into 99. They then took those funds, made some very significant payments, knowing that they, as long as they were current and as long as they were using money for farming operations, they would continue to be able to use those funds. So what happened is, and this is the right to use cash collateral, should it terminate if debtors do not make the payments stated above. And stated above is all the payments made for several years. In other words, what happens is, and what's also important in this particular case, is that the lien of IACA continues. It will continue into the 2001 crop. And all that the debtors are asking to do, the banned ordinance, is let us use the funds because we're current and we plan to use them in a farming operation to commence this crop. That crop already had 1,030-something acres of grain in the ground. It already had potato ground prepared. It had a potato crop that was significant in nature. Now, there's an ambiguity. Let's say there's an ambiguity in Article 13. The literal technical definition of cash collateral would say, once the plan is confirmed, there is no more cash collateral. In the context of the plan and the context that you were indicating, it suggests that couldn't be what they meant. In the event that there's an ambiguity in a contract, aren't we required just to send it back for an evidentiary hearing about what the parties intended in the meeting of the minds? Well, first off, we look at the contract, the agreement as a whole, and there really is no other meaning you can put upon it than that they got to use those funds on a year-to-year basis to make these payments. Secondly, you've had, who understand very well, four bankruptcy judges look at this particular issue. Now, I think in the case of three, there may be well an argument. It's a good argument that has been weighed. But none of them had any problem with the fact that you take a word because that word is incorporated into the plan and referring to use of certain funds. And the reason why it's cash collateral instead of merely crop proceeds is because cash collateral could be defined larger. It could be governmental payments or whatever the case may be. And therefore, I think that obviously ambiguity, if that's what you're looking at and finding, that's going to require you to determine that that's a question of fact. The finder of the fact is the bankruptcy judge. But the bankruptcy judge, interpreting his own order, has already determined there is no ambiguity because he determined that how else, how else would these farmers, because as the BAP indicated, you've got to have a practical implication. What's going to happen is this court, the bankruptcy court, excuse me, has to find that this plan is feasible. Otherwise, he cannot confirm the plan. And the plan is only feasible if they get to use his cash year to year. He made that determination by signing an order of confirmation. Now, IACA wants to take the essence of the entire plan out from underneath the Van Ordens because it puts them in a position where if they have to pay in December, which is in essence what IACA is saying, which is a rewrite of the agreement, they don't have any funds. They can't make the lease payments. They can't do startup costs. They're history. And that is in essence why it's important that this cash collateral provision, Article 14, excuse me, Article 13, be enforced. Now, it's interesting in this particular case with respect to the law, the law is pretty simple. It's just a matter that you look at it in its entirety. Look at what is the meaning of the mines. And when you take the meaning of the mines, it's not merely the stipulation that IACA wants to be concerned with. There is language in the plan with respect to their payments and things. That language, as well as Article 13 in their entirety, has to be looked at. The question of the other question, of course, is raised, is with respect to in the essence of default. For example, they said we used to provide a certain information, and yet if you look at the stipulation that was agreed upon, their stipulation provided that that information was not required until April 1st of that next year. In other words, what they are doing is the same thing as they were doing with respect to cash collateral. They were bringing it forward and making all these things happen before under the terms of the plan they required. Had the Van Ordens known that they were going to require such, then they would not have paid such significant payments as they did in the spring just after confirmation to the tune of $628,000 that went to these two parties. The issue of anticipatory breach, that's really an interesting issue because if you go back to the bankruptcy decision, A, the answer filed in the case did not plead it. It's not pled. B, I recognize that they've attempted to do a fair job with respect to reference to all of these different provisions that suggest it was before the court. I've been through those. I don't see anything anywhere that suggests that they were, in fact, that concept before Judge Pappas. Judge Pappas was not briefed on the issue of anticipatory breach, and as the BAP has so well noted, it's gone. So really, in essence, what the case is about is whether, in fact, a provision that says if there is a conflict between the stipulation and the plan, the stipulation shall control. So the question one has to ask themselves is, is there a conflict between them? The conflict that they claim is it somehow undermines their lien. Now, first off, clearly the stipulation, as does the plan, provides it for a lien. Secondly, it provides for a provision of subordination. They somehow say what you're doing is you're subordinating. Well, subordinating is to put them into a lesser class, and that clearly is not the case. Not put them into a lesser class. That's what is referred to as what would occur with respect to fertilizer and chemical, is to say you've consented to the use of funds. And why you've consented to the use of funds is because it's the only way it works. It's the only way you pay the Indian leases. It's the only way that you finish up the year and do that farming that you need to do for the next year, and it's the only way that you have that start-up cost, which happens well before May of each year. So, in essence, what happens is, is that it's nothing different than if a creditor who had a lien against a clothing store were to say we have a lien against your inventory, we have a lien against your cash, but the only way you're going to continue in business is for you to use those funds. Or it's nothing different than did, in fact, happen the year before bankruptcy, where IACA and Simplot said you need funds from grain. We will let you use those funds to harvest the potatoes. Now, do they have a lien in those, in the case of the clothing apparel? Yes. Do they have a lien in the case of the grain? Yes. But they can grant permission, and that's what they, in essence, did in this case. They said we'll give you permission, like it or not. It's kind of like they're having buyer's remorse. They're coming back in and saying we don't like this. We think this is wrong, but it is what they agreed to. And, therefore, they're wanting the court to change, rewrite their agreement, because they don't like, at this point in time, this result. It is what it is. It's consent to the use so that these people can raise their crops and give them a right, a lien, in the new crop. And that's what they bargained for, and that's what they all received. With respect to the issue of ambiguity, we don't think there's an ambiguity. There's two courts now that found no ambiguity. As they've looked at these various provisions and looked that they all come together, they're all construed, and when they come together, not only is there not a conflict, but there's no ambiguity. I really have nothing more to say. Does the court have any questions for me? No questions. Thank you. Thank you very much. Can you call the court? Is it cold in the courtroom? Well, not for me. All right. We'll see if we can't turn up the heat then. Make us sweat? Yeah. Or work for your money. I do want to mention that that's a good friend, colleague of mine. This is N. Randy Smith, who has recently joined your fine court, and I want you to welcome him and take care of him. We're delighted to have him on board. We have two Smiths now, Smith brothers. Thank you. I've got to hurry here just a little bit. First, on that issue of anticipatory breach, I think if we look at the bankruptcy court's opinion at page 10, he says, Simplot took the same position as IACA regarding plaintiff's request, refusing to release any of the liens until either, one, it received the 2001 payment, or it received proof from plaintiffs that there were sufficient proceeds remaining to pay its 2,000-year annual crop plan payment in full from the 2,000 crop. That's the demand that was made for adequate assurances. It's set forth in correspondence that are part of the record here. It was clearly raised below. I see that as part of the history, but when I look over on page 11, then it goes into arguments of the parties. Did they raise that as one of the arguments, or is that just part of the history? Well, in the briefs, it's raised as an argument. It's saying that they weren't in compliance with the plan and that they were in breach of the stipulation, because these are records, number one, they're required to provide to us anyway, but it was upon their receipt of this request that IACA and Simplot both got concerned that those payments weren't going to be available if they just started releasing their liens on all these crop proceeds. That really takes me to one of the main arguments that hasn't really been addressed here today, and that is this question about consistency between having a first-priority security lien and crop proceeds. Is that consistent with a provision that says the debtors can sell the collateral, use those funds, and pay any creditors they want? And then they argued to the bankruptcy court that the lien is unaffected, and apparently the bankruptcy court agreed the lien is unaffected. You know, the creditors that they would be paying would be unsecured creditors. I mean, I remember doing lien subordination agreements and somebody else is getting a higher security interest in the collateral. That doesn't seem to be relevant to whether you can use the cash proceeds to pay vendors who are providing a service. So I didn't understand that argument. Maybe you could explain a little bit. Well, I agree. There was the only subordination, the only thing provided in the stipulation that could affect the first lien priority position of IACA was the fertilizer supplier up to a specific amount of $300,000, not any more. It said we would not allow any subordinations for any other reasons or for any other purposes, and that's expressly signed in the stipulation. Now, the court tells us that if the debtors take that collateral and sell half of it and spend that, give it to other creditors, it has no effect on our lien position whatsoever. To me, I think about it like a big we have a security interest in a pie, and the debtor invites all of his friends over and they eat all the pie. We have no security interest left in the pie. It's lost. Well, wasn't a lot of these funds spent so that they could continue in business? And somehow revert. We realized that they were going to have. So they could pay off simplex. We realized that they were going to do that. But their budget, and by the way, on that issue of budget, read the brief because we quote the deposition testimony where Eugene Van Orden admits that the 1999 crop was to pay the 2,000 operating expenses. Right. Some of those expenses that we want to pay now out of the 2,000 proceeds were operating expenses for the year 2000, and even admitted that that was in violation of the budget that they proposed. That's all in deposition testimony that was before the district court. But, sure, we knew that they were going to need funds to continue to operate. The problem was is just this year, in 2000, in the end of the year, now it's just like the years before where they started getting further and further behind which required them to file the bankruptcy in the first place. They're starting to use capital necessary to make the payments and to operate the next year to pay last year's expenses. And the more that happens, the further and further they get behind. The more impaired IACA's position is, pretty soon there isn't any collateral left and there isn't any money left. And IACA and its members get left holding the bag. Thank you very much for your consideration. All right. Thank you very much.
judges: Pregerson, Ferguson, Ikuta